NO. 07-02-0466-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JANUARY 26, 2005

_____

BARBARA JEAN STANFORD, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 410TH DISTRICT COURT OF MONTGOMERY COUNTY;

NO. 02-04-02382-CR ; HON. K. MICHAEL MAYES, PRESIDING

_____

Before QUINN and REAVIS, JJ., and BOYD, SJ.[1]

Presenting four issues for our decision, appellant Barbara Jean Stanford challenges her conviction of murder by a jury as well as her court-assessed punishment of 55 years confinement in the Institutional Division of the Department of Criminal Justice. In those issues, she contends this court should: 1) reverse the trial court and dismiss the indictment because the evidence is insufficient to sustain the conviction or, in the alternative, reverse and remand the case for retrial, 2) reverse and remand the cause for retrial because

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004-2005).

appellant was denied her right to due process of law in that both the State and prior defense counsel inadequately investigated the case, 3) reverse and remand the case because appellant was denied "a full continuance requested, thereby denying appellant the additional time to locate witnesses and otherwise prepare for trial and resulting in deliberations beginning on the Friday preceding a holiday weekend," and 4) reverse and remand the case because appellant was denied a requested jury instruction regarding the use of a specific deadly weapon rather than a single instruction stating alternate deadly weapons. For the following reasons, we affirm the judgment of the trial court.

The issues presented by this appeal require us to review the relevant evidence in some detail even though it is somewhat lengthy. On August 9, 2001, the deceased, Thanh Nguyen (Nguyen), a staff pharmacist at Houston Northwest Medical Hospital, failed to report for work. According to the pharmacy manager, Marshall Steglich (Steglich), he had worked with Nguyen since July of 1982, and this was the first time that Nguyen had failed to show up for work at the appointed time. Because of Nguyen's absence, Steglich was called to fill in for Nguyen. On his way to work, Steglich went to Nguyen's house located some two to four miles from the hospital. Upon his arrival, he noticed some lights on in the house and both of Nguyen's vehicles were parked on the street adjacent to the house. Steglich knocked on the door, but no one answered. He then drove along the route that he thought Nguyen would have taken to the pharmacy, but did not see any sign of him, so Steglich called Nguyen's sister, Diem Volz (Volz), who had been listed as a reference number. Receiving a busy signal, Steglich drove to Volz's house and told her husband of his concern about Nguyen's failure to appear for work. After Volz, her husband, and two of Nguyen's brothers could not locate Nguyen, Volz filed a missing person's report with the

2

Harris County Sheriff's Department. In that report, she mentioned that Nguyen had presented appellant as his girlfriend and that appellant had told them she wanted to marry Nguyen.

Harris County Sheriff's Detective Jerry Davis Ferrell (Ferrell) conducted an investigation in the course of which he learned that there were cash withdrawals from Nguyen's ATM account as well as from his bank after August 9, the date of his disappearance. On August 13, after Ferrell had been working the case all day, he received a page at home from his sergeant notifying him that appellant had called the homicide office inquiring about the progress being made on the investigation of the Nguyen case. Ferrell contacted appellant, who he described as being very "agitated and defensive." She asked Ferrell to meet her the next day at the Humble patrol station which was close to her home. He met her the next day, August 14, and they discussed Nguyen's disappearance. Specifically, Ferrell said:

> She told me that for four, four and a half years, she had had a relationship with Mr. Nguyen that began when she had placed an ad in a local periodical, newspaper or something like that, for an escort service; and subsequent to that she had, in her words, tricked for him. She had provided sex for money on a few occasions; and then thereafter, had provided other girls to prostitute for Mr. Nguyen and that she had an ongoing relationship with him, whereby she received the money in return for putting Mr. Nguyen in touch with girls for himself or for other people, . . . .

Ferrell also averred that appellant told him that Nguyen had purchased a used automobile for her use. He said that appellant then agreed to follow him to the homicide office for an interview there.

3

## First Written Statement

Upon their arrival at the office, Ferrell said appellant agreed to give a written statement about her relationship with Nguyen. In that statement, she said that appellant would give her sums of money that were normally in the amount of $300, and sometimes as frequently as every week. She also said that Nguyen had taken one of her daughters as a deduction on his income taxes and additionally, in late November of 1999, had also given her a cashier's check in the amount of $4,600. Further, Nguyen had given her some rifles and bought a car "solely for her use and had placed her on his insurance." She admitted she gave a false driver's license and lied to the insurance agent about Nguyen being the father of her child. She also said that Nguyen had been stealing drugs from the pharmacy, and that she accompanied Nguyen to Galveston a few times with her children for the purpose of acting as a cover for Nguyen so he could sell the drugs. She admitted she had used his ATM card to make purchases until the card was confiscated by the machine. When that occurred, she called the Harris County Homicide Office to inquire about Nguyen. She averred that the last time she had contact with Nguyen was on August 5 or 6 and the last time she saw him was on July 29.

## Second Statement

After taking the first statement, Ferrell averred he had no idea whether Nguyen was alive or dead and continued to talk with appellant, which resulted in his taking a second written statement from her. In that statement, appellant said that Nguyen told her, "I have to get out of town for awhile so the heat will be off me." He admitted that he had stolen $60,000 and could steal more, to which she replied, "[W]ell, if you weren't fucking people out of drug money you wouldn't be in this boat." According to her, she said she did not want

4

to give any more information to the IRS or to the insurance agent. This made Nguyen very angry and he threatened to have her children taken away from her, to which she responded that she would tell the hospital that he had been stealing drugs. Then, she said, things "calmed down" and he ended up giving her money and the use of the credit card.

Appellant also said that about a year and a half ago, an Asian man had been asking questions about her and her daughter. She told Nguyen about this and he replied that there was some man he had cheated on a drug deal who was angry with him. She also referred to some suspicious expenditures that had been made by members of Nguyen's family. In addition, she said, Nguyen had given her some rifles, and she took them home and told her husband Rickye that her sister Lisa had given them to her. Rickye did not want two of the rifles, so she had him take those two to the pawn shop to sell them. She did not remember if she still had the pawn ticket.

Ferrell testified that after taking the statements, he felt that there was something she was being deceptive about, and "so long as she was willing to talk with me," he wanted to talk to her some more. He asked her to return the next day, which was August 15. During the course of that conversation, appellant admitted that "she had shot the victim and that he was now dead." She had buried him in the back yard. Ferrell placed appellant under arrest and gave her *Miranda* warnings. He then averred that appellant chose to give him a third written statement.

### Third Statement

In her third statement, appellant said on August 2, 2001, Nguyen asked her to go to Galveston with him so that he might "sell some more drugs that he had stolen from his job at the hospital." She refused and that "pissed [Nguyen] off." She then said that an

5

argument followed, in the course of which Nguyen threatened to steal appellant's two daughters and hide them in Vietnam and that he also wanted his car back. She replied that if he wanted the car to come get it before she drove it into the river and that she would pull it out on the street and he could get it there.

She then said that Nguyen returned about 3:30 p.m. on August 3, 2001, and pushed his way into the house. Appellant's one-year-old daughter started crying. Nguyen picked the child up and the pair started struggling for possession of the child. She "grabbed her revolver, Smith and Wesson .38 Special, silver-colored, [and] loaded." She pointed the gun at Nguyen and told him to give her the baby, which he refused to do. She shot him in the left temple, threw the gun on the floor, and proceeded to try to settle her daughter down. After doing so, she said, she got a kitchen knife, cut the hall carpet around the body and rolled the body in it.

She then dragged the carpet roll with the body out the front door and put it in the back of her trailer. She returned to her house, cleaned up the blood, cut up the rest of the hallway carpet and put it with the body. She proceeded to drive Nguyen's car to a K-Mart parking lot and took a cab home. Upon her arrival, she dug a hole behind the trailer, put the body and the carpet in it, "poured some diesel fuel on top," and set it afire. She averred that it burned down until "there was almost nothing there." She said that it was not unusual to burn trash in her neighborhood.

On August 5, appellant said she cleaned her revolver, "threw the fired cartridge in the San Jacinto River," and placed the gun in her desk. On August 8, appellant got her neighbor "Jorge" to aid her in going to get Nguyen's car from the parking lot and return it to the front of Nguyen's house. She said, "I didn't tell the whole story earlier because I had

6

been afraid that I would lose my kids." In addition to the statement, she drew a diagram showing the location of the burn pile and a diagram of her desk showing where the gun was located.

After Ferrell had obtained the statements and the diagram, he called the Montgomery County Sheriff's Office, relayed the information obtained from appellant, and asked them to take custody of appellant. In response to that call, Montgomery County Sheriff's Detectives Carey Mace, Bill Bucks, Lisa Pickering, and Lieutenant David Moore went to appellant's trailer house in Montgomery County before they took custody of appellant. Appellant's husband Rickye was there and gave the deputies permission to search the house and the adjacent area. When queried whether he or appellant had a gun, Rickye produced a Smith Wesson .38 caliber revolver from a space on a desk near a computer monitor.

Montgomery County Sheriff's Detectives Buck and Pickering then went to pick up appellant at the Harris County Sheriff's Office, took her to a magistrate to have her rights read to her, and then proceeded to the Montgomery County Sheriff's Office. Upon their arrival there, appellant told Pickering that she wanted to amend her previous statement. She was given her *Miranda* rights.

Appellant's Fourth Statement

In this statement, dated August 16, 2001, appellant said that although she told her husband on August 10, 2001, what had happened, they did not call the police because they were afraid for their children. After she told her husband, he was "very upset and scared." She dug up "the stuff," bagged it, and "took it to a dumpster in Humble." She and her husband then filled up the hole in their yard and put grass seed over it. In ending this statement, she said: "I have done . . . horrible Godawful things that I can never change,

7

I am truly sorry and wish that I could go back and change things and know that I will always think of this and <u>pay</u> inside for doing such horrid things. I am truly sorry and suffering from this."

Appellant's Fifth Statement.

On August 17, 2001, appellant again asked to talk with Detective Bucks. After again receiving her *Miranda* rights, Bucks averred that appellant told him "she had forgotten to tell us about a pipe wrench that the victim had fallen on and there was a lot of blood on it and that she had gotten rid of the wrench by throwing it off a bridge." Bucks then informed her that another detective had found some "medium velocity impact blood splatter" generally associated with a beating or stabbing, in the hallway of appellant's house and because of that, he did not believe her. He said appellant then became "[v]ery angry" with him and he terminated the interview because he did not believe she was being honest with him.

On August 22, 2001, Bucks said appellant again asked to speak with him. After receiving her rights, appellant gave another written statement. In that statement, appellant gave an account of her activities and, in some respects, amended portions of her earlier statements. In relevant part, she said:

> I picked up a large wrench which was lying on the floor next to the air conditioner. I struck Thanh [Nguyen] on the left side of the head with the wrench. Thanh turned around and said you're going to jail now for hitting me and I'm going to get the kids. Catherine was screaming and trying to get away from Thanh, so I hit him again with the wrench which knocked him to his knees. Catherine was still screaming, but Thanh would still not let go. I hit him a third time with the wrench in the head and Thanh fell backwards and let go of Catherine. Thanh fell onto his back, trapping Catherine's lower legs underneath his butt area. Thanh was trying to pull Catherine up on his chest and said 'I'm going to hurt Catherine like you hurt me.' I dropped the wrench on the floor and picked up the pistol that I had dropped and pointed it at Thanh's head from approximately two feet away and fired the pistol one time

8

hitting Thanh on the left side of his forehead near his temple. Thanh did not move much after that.

In this statement, appellant additionally explicated what she did after she shot Nguyen as follows:

> I only cut the first five or six feet of the carpet out of the hallway at this time. I dragged the rolled up carpet out of the front door of my home and dragged it into the backyard. There was a hole in the ground on the south side of our trailer from a stump being removed. The hole was about two to two and one-half feet deep already. I dug the hole about six to eight inches deeper. I then dragged the rolled up carpet with Thanh in it into the hole. I put some wood fence pickets on top of the rolled up carpet.

Appellant went on to say that there was blood on a bookshelf in the hallway so she took it out and put it on top of the fence pickets, then put diesel "gasoline" on top of the pickets, let it set for ten to fifteen minutes while she went back into the house to clean up the blood in the hallway. While she was there, she noticed blood on a clothes basket full of books in the hallway which she also placed on the fire. The next day, August 4, 2001, with the aid of her husband, whom she said did not know about the homicide at the time, she put some old clothes and plastic toys on the burn pile, added some more diesel fuel, and relit the fire. On August 7, 2001, around noon, appellant said she put more items on the burn pile, added more "diesel gas" and lit the fire. Later, about 3:00 p.m., she said she dug up the burned remains and put them in the backyard beside the trailer. On August 11, "because they were beginning to stink," she took the bags to a dumpster at an apartment complex in Humble.

Appellant also said that on August 6, 2001, she asked her friend Jorge "to help move a T.V. from a friend's house," and they went to Nguyen's house. Once there, she told Jorge that he could take whatever he wanted because the friend owed her money. The pair

9

took several items from the house, including eight rifles, and then went to an ATM machine where she "pulsed" $300 using Nguyen's Visa debit card. She used the same card again on three other occasions obtaining $300 each time, which she used to purchase various items, including a riding lawnmower which was later recovered at her home. On August 13, 2001, she asked Jorge to accompany her once more to Nguyen's home to help her move a television set. However, upon their arrival, the doors were locked and she remembered she had left her keys inside the house on her earlier trip. She later called Nguyen's employer and was told he was missing. She then called the sheriff's office, which resulted in her conversation with Ferrell.

Appellant's Sixth Statement

On August 24, 2001, appellant again asked to speak with Detective Bucks. He was not available so she spoke with Detective Mace, who took another written statement from her. In this statement, she explained where she had disposed of the shell casing from the pistol, the wrench, and a laptop computer she had purchased with some of the money taken from Nguyen's ATM account. She also gave additional information about her activities since the incident. She ended this statement by exonerating her husband by saying, "My husband had no idea what I had done, and was innocent of all the things that happened . . . ."

As additional evidence supporting the jury verdict, the State points to testimony from appellant's sister that appellant phoned her from jail and admitted to her "that she killed a person because he was going to take her baby and leave and go to Vietnam." It also refers to testimony by a reporter stating that appellant had admitted to him that she shot Nguyen, took his body to a stump hole, then returned to her house and cleaned up. However, she made no reference to the use of a wrench. The State further refers to the evidence that

10

DNA tests of the blood splatter material taken from the hallway of appellant's home matched the DNA of skin cells taken from an electric razor obtained from Nguyen's house. Additionally, it emphasizes a written statement by appellant's husband in which he says that appellant told him that on August 3, 2001, "she had removed a problem, a man who had threatened her and our kids."

In the statement, appellant's husband also said that he had helped burn things on the pile started by his wife, and that on August 13, 2001, he bagged "smelly mud" from the burn pile and disposed of it in an apartment complex dumpster in Humble. He said that on August 9, 2001, appellant asked him to discard a pipe wrench that "[s]he said had blood on it and she had cleaned it off, but she wanted it gone." He described the place where he had thrown it. The police located a wrench where he said he had discarded it and DNA tests of blood taken from the wrench matched that of Nguyen. There was police testimony that the "medium velocity" blood splatter found in appellant's hallway was in a manner that generally indicated a beating.

There was further testimony that eight bone fragments found in the burn pile in question were identified as human bones, as well as testimony by Nguyen's sister that an unusual ring found in the burn pile belonged to Nguyen. Family photos received into evidence showed Nguyen wearing a similar ring on his middle finger.

Reiterated, in her first issue, appellant contends that we should reverse the trial court and dismiss the indictment against her because the evidence is insufficient to support the conviction or, in the alternative, we should reverse and remand for a new trial. We will consider this contention as raising both legal and factual insufficiency issues. In assessing the legal sufficiency of evidence to support a conviction, as articulated in *Sanders v. State*,

11

119 S.W.3d 818, 820 (Tex. Crim. App. 2003), we must determine whether, after viewing the evidence in the light most favorable to the verdict, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The court also instructs that this standard is meant to give full play to the jury's responsibility to "draw reasonable inferences from basic facts to ultimate facts." *Id*. at 820; *see* also *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560 (1979).

In supporting her legal insufficiency argument, appellant points out that the evidence presented by the State was predominantly circumstantial in that no body was ever discovered and no witness to the murder testified at trial. She recognizes that the State presented her extrajudicial statements, but argues that the statements were inconsistent and changed over a period of time, with the changes being correlated with information given her by law enforcement personnel and her husband. Considering that, appellant argues that the other evidence is not sufficient to prove the *corpus delicti* of the underlying crime of murder.

The *corpus delicti* rule is one of evidentiary sufficiency that provides that an extrajudicial confession of wrongdoing, standing alone, is not enough to support a conviction and there must be other evidence demonstrating that a crime has in fact been committed. That other evidence is commonly referred to as the "corpus delicti." The rule does not require independent corroboration of each element of the underlying crime but rather that there be some independent evidence tending to show the essential nature of the charged crime. The other evidence need not be sufficient by itself to prove the offense, but must be sufficient to render the commission of the offense more probable than it would be without the evidence. *Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002); *Rocha v. State,* 16 S.W 3d 1, 4 (Tex. Crim. App. 2000). The historical justification of the rule in a murder case

12

such as this one is to guard against the deleterious effect upon the criminal justice system if a murder victim suddenly reappeared after his self-confessed murderer had been tried and executed. *Salazar v. State,* 86 S.W.3d at 644.

The evidence showed that on August 9, 2001, Nguyen failed to show up for work for the first time in his 19 years employment at the pharmacy at the Northwest Medical Hospital and has never again been seen by his manager or family. In her fifth statement, appellant said she had killed Nguyen by hitting him with a wrench, rolled his body in a carpet and dragged him to a hole in her backyard which was set afire. She also said that things in the hole were set afire on three different occasions. She further admitted that the remains were later bagged and taken to a dumpster in the parking lot of an apartment complex. There was evidence that the blood splatter found in the hallway of appellant's house was of the type generally associated with a beating, and DNA tests showed that the blood in the splatter, as well as the blood on a ten-pound wrench, matched the DNA taken from skin cells found in Nguyen's razor. Additionally, human bones and an unusual ring identified by Nguyen's sister as his and which was shown in a photo were also found in the burn pile. Suffice it to say that the evidence other than the extrajudicial confessions is amply sufficient to satisfy the requirement of the *corpus delicti* rule. Moreover, in her extrajudicial confessions, while changing somewhat in the details of the crime and her reason for committing it, appellant was consistent in admitting that she actually killed Nguyen. Those confessions were sufficient to establish her identity as the perpetrator of the crime. *Emery v. State*, 881 S.W.2d 702, 706 (Tex. Crim. App. 1994). Viewed in the light by which we must view it, the evidence in this record is both legally and factually sufficient to sustain the jury's guilty verdict. Appellant's first issue does not reveal reversible error and is overruled.

13

As noted above, in her second issue, appellant contends her constitutional due process rights were violated because the State failed to thoroughly investigate the case, including the possibility that someone else might have committed the crime. This contention is intertwined with the argument that appellant's first trial counsel provided her ineffective assistance. With regard to the asserted "due process" failure of the State to adequately investigate the case, we note that the record does not show this contention was ever presented to the trial court by a motion for mistrial, objection to the testimony of any officers, motion for new trial, or otherwise. Accordingly, the issue has not been preserved for appellate review. Tex. R. App. P. 33.1; *Johnson v. State,* 963 S.W.2d 140, 142 (Tex. App.–Texarkana 1998, pet. ref'd).

We recognize that there are a few constitutional rights so integral to the operation of the system that inaction will not result in waiver. *See Hawkins v. State,* 964 S.W.2d 767, 769-70 (Tex. App.–Beaumont 1998, pet. ref'd). However, under this record, the State's investigative procedure is not shown to fall within that type of exception. The record shows that appellant confessed to all the elements and evidentiary facts of the murder charge. She stated six times unequivocally that she alone murdered Nguyen by either shooting him or by hitting him with a wrench three times and then shooting him. When a defendant unequivocally admits or confesses to a crime, those admissions or confessions are direct, not circumstantial evidence of a crime. *Ridyolph v. State,* 545 S.W.2d 784, 789 (Tex. Crim. App. 1977).

Additionally, the confessions were corroborated by the evidence about DNA profiles of the blood stains and blood splatters we mentioned in our evidentiary recap, and there was evidence that human bones were found in the burn pile identified by appellant, along with an

14

unusual ring owned by Nguyen. The confession statements about appellant's relationship with Nguyen were corroborated by a Nguyen family picture received into evidence showing appellant and her child with the group, as well as a photo album found at Nguyen's home, labeled "Rebecca" Stanford Nguyen (appellant's daughter), containing pictures of appellant and her daughter. There was also the evidence of ATM pictures showing appellant using Nguyen's ATM card, and that Nguyen's car insurance covered appellant as a driver of the car Nguyen assertedly bought for her. If, indeed, the State's investigative procedure violated appellant's right to due process and a fundamentally fair trial, her remedy is through a post-conviction writ of habeas corpus. *See Ex parte Mowbray,* 943 S.W.2d 461 (Tex. Crim. App.1996); *Ex parte Brandley,* 781 S.W.2d 886 (Tex. Crim. App. 1989).

With her claims of insufficient investigation by the State, appellant also intertwines a claim of ineffective assistance of counsel. In buttressing that claim, she relies upon the proposition that to render effective assistance in a criminal case, counsel must conduct an independent investigation to determine if law enforcement personnel pursued all information that could shed light on the charged offense, or whether they only pursued information consistent with a preconceived determination of the guilt of the accused. *See, e.g., Ex parte Brandley*, 781 S.W.2d at 890-94.

Specifically, she asserts that her first defense counsel failed to:

1. Inspect the State's physical evidence.

2. File sufficient pretrial motions.

3. Be present at a pretrial hearing held on December 14, 2001, although he was present for the arraignment hearing on December 17, 2001.

4. Inspect appellant's mobile home before it was moved from the property, or "preserve it in its August 15, 2001, state for defense examination."

15

5. Identify and locate defense witnesses, including Harris County Sheriff's Sergeant S.D. Ruggiero and Israel Reyes, in time for them to testify at trial.

6. Retain any expert witnesses.

The standards by which we evaluate ineffective assistance of counsel are articulated in the seminal case of *Strickland v. Washington,* 466 U.S, 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Hernandez v. State,* 988 S.W.2d 770, 772-74 (Tex. Crim. App. 1999), the court provided that the *Strickland* standards are applicable in Texas to determine claims of ineffective assistance of counsel. The *Strickland* court explained that the purpose of the Sixth Amendment guarantee of effective assistance of counsel was "simply to ensure that criminal defendants receive a fair trial." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

To determine if counsel's performance met that standard, the *Strickland* court promulgated a two-prong test usually stated as: 1) whether her counsel's conduct was deficient; and 2) whether but for counsel's deficient performance, the result of the proceeding would have been different. *See Hernandez,* 988 S.W.2d at 770 n.3. The high court also articulated that an error by counsel, even if professionally unreasonable, would not warrant setting aside a judgment in a criminal proceeding if the error had no effect on the judgment and, to demonstrate the requisite prejudice, an appellant must show that there is a reasonable probability that, but for the errors, the result of the proceeding would be different. The court defined a "reasonable probability" as one sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 691, 104 S.Ct. 2068. In *Boyd v. State,* 811 S.W.2d 105, 109 (Tex. Crim. App. 1991), the court cautioned that absent both showings, a reviewing court cannot conclude that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable.

16

The record before us simply does not justify a conclusion that, but for any of the alleged errors on the part of appellant's first counsel, the result of her trial would have been different. This is particularly true in view of the fact that appellant signed six confessions that she murdered Nguyen by herself, the evidence corroborating those confessions, and her exoneration of her husband in any participation in the murder. We also note that the record shows that her trial counsel had five weeks to prepare for trial and mounted a vigorous defense in the course of which he presented some 15 witnesses. Issue number two is overruled.

In her third issue, as we noted above, appellant posited that we should reverse and remand this case for a new trial because of the trial court's refusal to grant her a two- week continuance and instead granted a one-week continuance. She was harmed, she argues, because the refusal to grant the full continuance denied her additional time to locate witnesses and "otherwise prepare for trial" and "resulted in deliberations beginning on the Friday preceding a holiday weekend . . . ."

As appellant recognizes, the determination whether to grant a motion for continuance is within the court's discretion. *Corley v. State*, 582 S.W.2d 815, 820 (Tex. Crim. App. 1979). She also recognizes that she has found no authority that deliberations beginning on the day before a holiday would lose rationality as a result. Moreover, the record does not show that this particular argument was ever presented to the trial court. As we have noted above, Rule 33.1(a) of the Rules of Appellate Procedure requires that to preserve a matter for appellate review, a timely request, objection, or motion must be made that states "the grounds for the ruling that the complaining party sought from the court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the

17

context" and that the trial court ruled or refused to rule on the matter. That being true, that question is not before this court for decision.

We are then relegated to determining whether by making only a partial grant of the motion, the trial court abused its discretion. The record reveals that the trial court heard a motion to substitute trial counsel on April 12, 2002. At that time, the court granted the motion with the admonition: "We're set for trial in May. We're not going to be postponing the trial because of new counsel, so either work it out or go to trial." Regardless of the judge's comment, appellant filed a motion for continuance on May 9, 2002, in which it was asserted that co-counsel had a conflict with the May 13, 2002 trial date and she needed the presence of co-counsel at the trial and, further, there was not adequate time for her experts to examine "[e]vidence that should be in the possession of the prosecutor [that] is not in the prosecutor's file." She requested a two-week continuance for those purposes. Upon a discussion with counsel about what needed to be done, the trial court granted a one-week continuance.

On May 16, 2002, the trial court held a hearing on appellant's motion to suppress. The court concluded the hearing with the comment: "See y'all Monday, [the trial date previously set] at right around 1:00 o'clock. Okay?" Further, at the beginning of voir dire on the trial date, appellant again did not raise her concerns. After examining the entire record in this case, we cannot say that the trial court abused its discretion in refusing to grant the full continuance requested. Appellant's third issue is overruled.

In her fourth issue, appellant contends the trial court reversibly erred in refusing her requested jury instruction regarding the use of a specific deadly weapon rather than a single instruction stating alternate deadly weapons. In the instruction given, the jury was told it could find that appellant "intentionally or knowingly cause[d] the death . . . by shooting him

18

with a firearm or by striking him with a wrench . . . ." The same instruction permitted appellant's conviction if the jury found that appellant "with intent to cause serious bodily injury . . . committ[ed] an act clearly dangerous to human life, by shooting him with a firearm or by striking him with a wrench that caused the death . . . ."

In support of this argument, appellant points to what she describes as the inconsistent statements in her various confessions concerning the manner of the victim's death. She notes the statements in some confessions indicating that he was shot with a firearm with those stating that the victim was struck with a 24-inch long, ten-pound pipe wrench. Her requested instruction would expand the instruction to contain four alternatives rather than two. She reasons that if her requested instruction had been given, it would have "called the jury's attention to the conflicting evidence regarding how the victim died." Noting that the jury had evidence of the strength of appellant's husband, she reasons that the jury could see appellant at the defense table and form an opinion as to her strength. Thus, she continues, the jury "focused on that strength comparison and the conflicting evidence presented, would have to consider whether the 5-foot, 5-inch tall, 110 pound female could have swung the 24-inch long, 10-pound pipe wrench at a speed of 5 to 25 feet per second, in a hallway, under a 7-foot, 5-inch high ceiling."

Appellant's only trial objection was "I object to the compound nature of the charge on the two alternates found in the indictment" without amplification as to the basis of that objection. We have stated above her appellate contention. We agree with the State that appellant's suggested submission for the purpose she suggests would effectively violate that portion of Texas Code of Criminal Procedure article 36.14 which provides that a judge should deliver a charge "not expressing any opinion as to the weight of the evidence, not summing

19

up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." Tex. Code  Crim. Proc. Ann. art. 36.14 (Vernon Supp. 2004-05).  Appellant's fourth issue is overruled.

In sum, all of appellant's issues are overruled, and the judgment of the trial court is affirmed.

John T. Boyd
Senior Justice

Do not publish.